## Case No. 3,973.

### The DOLPHIN.

[1 Flip. 580; 5 Ins. Law J. 931; 8 Chi. Leg. News, 401; 3 Cent. Law J. 628.] [1]

District Court, E. D. Michigan. June 12, 1876. [2]

MARINE INSURANCE—LIEN FOR PREMIUMS—WHAT THE LIBEL SHOULD AVER.

1. There is a lien in favor of an underwriter against a ship for premiums due upon marine policies. He is entitled to have this paid out of proceeds of sale.

[Cited in The Theodore Perry, Case No. 13,879; The Illinois, Id. 7,005; The Jennie B. Gilkey, 19 Fed. 131; Re Insurance Co., 22 Fed. 115; The Hope. 49 Fed. 279. Disapproved in Insurance Co. v. Proceeds of The Waubaushene, 24 Fed. 559; The Daisy Day, 40 Fed. 541, 604.]

2. The petition or libel should aver the amounts and dates of the policies, the names of the parties insured. and the extent and character of their interests in the vessel. It should also appear that the policy was a marine policy, or at least that it covered the vessel during the season of navigation.

This cause was heard on exceptions to the libel of the Orient Mutual Insurance Company. The libellant stated that this was a New York corporation; that the Dolphin was a vessel used in navigating the Great Lakes and waters connecting the same, and was over twenty tons burthen; that the master and owners, on the 6th day of March, 1875, represented to the libellant that the vessel stood in need of insurance, and that in pursuance of their representations libellant furnished insurance on said vessel in the sum of $4.000; that there was due to libellant on premiums $277.38, and for which libellant claimed a lien against the vessel. Stephen B. Grummond, who had also filed a libel against the vessel for salvage, excepted, insisting that a claim for premiums was not within the jurisdiction of the admiralty court, and that such claim was not a lien upon the vessel such as the court would enforce in rem. The vessel had been sold on account of other claims, and the proceeds were in court awaiting distribution.

W. A. Moore, C. E. Warner and F. H. Canfield, proctors, represented a number of libellants.

J. J. Atkinson, for the insurance company.

BROWN, District Judge. The question presented by the exceptions to the libel is

one of great novelty and importance; and it is believed that no direct adjudication upon the point can be found either in this country or in England. After years of doubt in the minds of the profession, and some conflict of opinion in the courts, it was finally settled by the supreme court in the case of Insurance Co. v. Dunham, 11 Wall. [78 U. S.] 1, that the contract of marine insurance is maritime in its character, and that in case of loss a libel may be sustained by the insured against the underwriter. It seems to me to follow as a necessary corollary that the underwriter may maintain a suit in admiralty for the premium, as it would be at war with established principles to say that the maritime character of a contract could be invoked by one party and not by the other.

The more serious question, however, remains to be decided, namely, whether the underwriter has a lien upon the vessel for the payment of his premium. The question is not discussed in this case, nor in any other, where actions have been sustained in the admiralty upon contracts of insurance. If the analogies of the contract of affreightment are to govern, as indicated by the supreme court in the opinion above cited (page 30), the lien would follow as a necessary consequence. It is described in the opinion as a "contract or guaranty on the part of the insurer, that the ship or goods shall pass safely over the sea, and through its storms and many casualties to the port of its destination, and if they do not pass safely, but meet with disaster from any of the misadventures insured against, the insurer will pay the loss sustained. So, in the contract of affreightment, the master guarantees that the goods shall be safely transported, dangers of the sea excepted, from the port of shipment to the port of delivery, and there delivered. The contract of the one guarantees against loss from the dangers of the sea; the contract of the other from loss from all other dangers. * * * The object of the two contracts is in the one case maritime service, and in the other maritime casualties." If in the one case the shipper has a lien upon the vessel for a breach of the contract of affreightment, and the ship has a lien upon the cargo for the payment of the freight, though for reasons applicable to the character of this property, this lien is dependent upon possession, it is difficult to see why upon principle the underwriter should not have a lien upon the ship for the payment of his premium.

It is true the general sentiment of the profession is adverse to the existence of such a lien, but no more so, perhaps, than it was to the jurisdiction of the admiralty in actions upon policies of insurance. In the case of The Williams [Case No. 17,710], perhaps the most exhaustive disquisition upon maritime liens to be found in the books, the judge remarked: "Without any very thorough examination at the time, but drawing mainly upon what we had ever assumed to be the

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 8 Chi. Leg. News, 401. and 3 Cent. Law J. 628, contain only partial reports.]

[2] [Affirmed in The Dolphin, Case No. 3,974.]

law, we ruled that all maritime contracts, made within the scope of the master's usual authority, did per se hypothecate the ship; and that those of affreightment, insurance, towage, the fitting out and discharge of vessels, and for aiding them in distress, were instances only of the application of the rule." I should have no hesitation in adopting the general principle there announced, that all contracts within the scope of the master's authority are binding upon the vessel, but in its application to the contract of insurance, I think the learned judge overlooked the fact that such contracts are not within the scope of the master's authority. General Interest Ins. Co. v. Raggles, 12 Wheat. [25 U. S.] 408; Foster v. United States Ins. Co., 11 Pick. 85. Even a ship's husband, whose powers with regard to the fitting and equipment of a vessel are much more extensive than the master's, has no authority to bind the other part owners by a contract of insurance. Bell v. Humphreys, 2 Starkie, 345; Finney v. Warren Ins. Co., 1 Metc. (Mass.) 16.

The case of The Williams was that of a contract for services in the nature of salvage, made by a master whose power was unquestioned, and is a direct authority only for the proposition that all contracts, whether executed or executory, which he makes within the scope of his authority are binding upon the vessel. Obviously, however, the learned judge based his opinion upon a much broader principle. Referring to the case of Bearse v. Three Hundred and Forty Pigs of Copper [Case No. 1,193], he observes: "This judgment is referred to in this connection more particularly to illustrate the position that a denial of salvage is not a rejection of a proceeding in rem; but it quite as fully sustains the broader proposition, soon to be considered, that all authorized maritime contracts pledge the vessel for their performance." Again, he says: "The wider principle that every maritime agreement binds the ship as well as the owner, is that upon which we rest our decision." Although the authorities cited in support of this proposition refer to cases of salvage, or of contracts within the scope of the master's authority, and therefore do not sustain it to its fullest extent, yet I apprehend the principle is a safe one, and subject to two or three exceptions, which at an early day were imported into the maritime law of this country by the supreme court, following too closely the English authorities, one which may be acted upon without trenching upon the proper domain of the common law. So far as a dictum can be an authority, it is certainly an authority for the lien of the underwriters.

The doctrine that the admiralty courts of this country are restricted to the jurisdiction exercised by the high court of admiralty in England at the time of the adoption of our constitution, is now so completely overthrown that no argument can be properly deduced from it. The only exceptions believed to exist to the jurisdiction in rem of the admiralty over maritime contracts is that of supplies furnished domestic vesels, established in the case of The General Smith [4 Wheat. (17 U. S.) 438], and recently recognized in the case of The Lottawana, 21 Wall. [88 U. S. 654] and that of master's wages, held not to be the subject of a lien in the case of The New Orleans v. Phoebus, 11 Pet. [36 U. S.] 175. Contracts for the construction of vessels which are recognized as maritime by the continental codes, and a lien given thereby, were also held by the supreme court, in the case of Roach v. Chapman, 22 How. [63 U. S.] 129, not to be subject to the admiralty jurisdiction in any form.

In determining whether a maritime lien exists in favor of the underwriter, it is well to consider the source of the doctrine, that courts of admiralty have jurisdiction over policies of insurance. The subject is fully discussed in the case of Insurance Co. v. Dunham [11 Wall. (78 U. S.)] 31–38, and the court remark: "Perhaps the best criterion of the maritime character of a contract is the system of law from which it arises, and by which it is governed. And it is well known that the contract of insurance sprang from the law maritime. and derives all its material rules and incidents therefrom. * * * These facts go to show, demonstrably, that the contract of marine insurance is an exotic in the common law. And we know the fact historically, that its first appearance in any code or system of laws was in the law maritime, as promulgated by the various maritime states and cities of Europe." Mention is here made of the maritime laws of the ancient Rhodians, of the ordinances of Barcelona, Venice, Florence, and Antwerp; and the court further observe: "But an additional argument is founded on the fact that in all other countries except England, even in Scotland, suits and controversies arising upon the contract of maritime insurance are within the jurisdiction of the admiralty or other marine courts. * * * It is also clear that, originally, the English admiralty had jurisdiction of these as well as of other maritime contracts. * * *" This last remark is corroborated, not so much by positive adjudications to that effect as from the language of the commissions issued to the early vice admiralty courts. which authorize them to take cognizance of marine policies. This would hardly have been done had such jurisdiction never been exercised by the high court of admiralty in England.

Tracing, then, the jurisdiction of the admiralty over contracts of insurance to the continental law, it is pertinent in this connection to inquire whether that law gives to the underwriter a lien upon the vessel for the payment of his premiums

Article 16 of the marine ordinance of Louis XIV., tit. "Of Seizure of Vessels," in enumerating the persons entitled to liens upon ships, makes no mention of underwriters; but Va-

lin, in commenting upon this ordinance (book 1, lib. 14, § 16) says: "If this article had not mentioned them (the underwriters), it is probably because the ordinance takes it for granted, in many articles under the title of 'Insurance,' that the premium is paid in cash at the time the policy is signed, while, by the custom of this place, and of many others, it is paid after the arrival of the ship at a port of safety. However this may be, the insurer of a vessel has doubtless a lien (privilege) upon her for the payment of his premium as the insurer of a cargo has a lien upon it. This lien ranks with that of the lender upon bottomry and with material men."

A privilege is defined by article 2095 of the Civil Code as "a right which the character of a credit gives to a creditor to be preferred to other creditors, even mortgages (hypothecaries)." If not analogous in all respects to our "lien," it authorizes the like preference in payment to claims within its scope from the proceeds in court.

Emerigon treats the contracts of insurance as analogous to that of maritime loan or bottomry, and observes (Emerig. Mar. Loans, c. 1, § 4): "In the one contract the lender bears the sea risks; in the other, the underwriter. In the one, the maritime interest is the 'price of the peril,' and this term corresponds with the premium which is paid in the other. In either case, it is incumbent upon the plaintiff to prove that the condition has been fulfilled. In case of a suit, it lies upon the lender, in order to render the contract of maritime loan executory, to show that the ship has arrived at her port of destination in safety; and in an action on a policy of insurance, it lies upon the assured to prove the loss, capture, or shipwreck of the vessel. * * * The policies of insurance made on loose sheets of paper create a lien on the property of the parties, provided they are executed before sworn brokers or notaries; but the other contracts do not create such a lien unless they are recorded by a notary in his public register, in the sworn form as ordinary contracts." Again, in his work upon the Contract of Insurance (chapter 3, § 9), Emerigon says: "The ordinance having regarded the premium as paid in cash upon signing the policy, the insurer, who had not been paid, was not placed among creditors whose ranks and preferences are determined by articles 16, 17, tit. 'Seizure of Vessels.' From this silence, it has been often concluded that the insurer had no privilege, because it is said the matter of privilege is stricti juris (droit etroit), it is necessary they be expressly bestowed (deferes) by law, and it is never permitted to extend them from one case to another, because of equal or superior qualities. But it should be considered that the premium of insurance is comprised in the expense of the equipment or building; it becomes, then, in some measure, part of the thing insured, which by this means is presumed to have an increased value (valoir davantage). Consequently, the privilege which the ordinance accords to the seller or material man ought to be common to the insurer, a creditor to the amount of his premium."

In support of this doctrine the learned author cites several decrees of the tribunal of commerce. So, also, Alauzet, Des Assurances, pt. 2, § 2. c. 15: "It is rare that maritime premiums are paid in cash; they are settled generally in notes called 'premium notes' (billets de prime), the maturity of which varies with the length of the voyage and the usage of the place; the lien of the insurer is preserved for the payment of the notes; they are not considered as working a novation, provided always the discharge (quittance) be not absolute, and the origin of the notes not doubtful." See, also, Cleirac, pp. 237, 318, 323, 363; Pothier, Des Assurances, c. 3, art. 3, § 2; 1 Boulay-Paty, tit. 1, § 2.

If any doubts, however, ever existed in the law of France with regard to this lien they are put to rest by article 191 of the Commercial Code, which reads as follows: "Privileged debts are the following, and in the order in which they are classed: 1st. Judicial costs and other charges incurred in obtaining a sale of the vessel and a distribution of the price. 2d. The charge for pilotage, tonnage, hold fees, mooring and dockage. 3d. The wages of the keeper, and the expenses of guarding the vessel from the time of her entrance into port to the sale. 4th. The storage of her rigging, tackle, and apparel. 5th. The expenses of repairing the vessel, rigging and apparel since her entrance into port from her last voyage. 6th. Wages and pay of the captain and crew employed in the last voyage. 7th. The sums loaned to the captain for the necessary expenses of the vessel during the last voyage, and the reimbursements of the price of goods sold by him for the same purpose. 8th. The sums due to the vendor, material men and workmen employed in her construction, if she has not yet made a voyage; and those due to creditors for furnishing work, labor, and for refitting, victualing, outfits and equipments before the departure of the vessel, if she has already made a voyage. 9th. The sums loaned on bottomry, on the rigging and apparel for repairs, victualing, outfit, equipment before the departure of the vessel. 10th. The amounts of the premiums of insurance effected on the hull, rigging, apparel, outfit and equipment of the vessel for her last voyage. 11th. The indemnity due to the freighters for not delivering goods laden on board, or for the losses which the goods may have sustained from the default of the captain or crew. The creditors comprised in each of the numbers of the present article shall have a concurrent lien on the vessel for the amount of their demand, and, in case of insufficiency, the price of the vessel shall be divided equally among them (i. e., those

of the same class) in proportion to the amount due each." In a recent work upon the Commercial Code of France, by Edmund Dufour (Paris, 1859), in speaking of this article (section 115), the author observes: "We see that if the Code has admitted this opinion (of Valin) as to the principle of the lien, it has largely modified the combinations. The underwriters are still paid before the shippers, but that is all. They are ranked by the material men, who are placed two degrees above them in the scale of liens. They are also distanced by lenders upon bottomry, who immediately precede them. This classification appears to me more rational than that of Valin. For the truth is, insurance is only a private affair of the insured; it is a very proper act of prudence; it certainly merits and it possesses all the sympathies of the law; but it is, after all, only a passive element of navigation. It rather repairs disasters than comes directly in aid of them by its efforts. It is otherwise with the material men, as well as with lenders upon bottomry. It is the labor of one, and the goods or the money of the other, which permits the vessel to undertake its voyage. There is then in their favor a reason for preference, which is not wholly arbitrary, and the Code has done well in recognizing it." The nature of this lien is discussed at length, and is applied as well to time policies as to policies for a single voyage.

In a recent admirable dictionary of the maritime law of France, by Aldrick Caumont (Paris, 1867), under the head of "Marine Insurance" (section 141), the author observes: "A lien is attached to the premium for the last voyage, if it be that made during the life of the policy upon the hull. This lien for the last voyage, resulting from articles 191 and 192, exists whenever there is a policy executed. The insured, who, asserting his right to suit, has attached the proceeds of the ship for the amount of his premium, is not permitted to claim a lien for the increase of premium for the time during which navigation is closed. Any number of voyages made during the time fixed for the duration of the insurance are considered as one and the same voyage. The broker has a lien upon the sum assured for the premium which he has paid. The liens for premiums of insurance upon property rank only after that accorded to contracts of bottomry. They constitute an expense made for the preservation of the res. In case where an insurance upon the hull has been made for a limited time, the underwriters have a lien upon the ship, not only for the premiums of the last voyage, but also for the entire premium due under the policy." In support of these various constructions of article 191, the author cites opinions of the court of cassation, of the imperial courts of Bordeaux, and Rouen, and Aix, and of the tribunal of commerce of Marseilles.

From these authorities I gather the following summary of French law upon the subject: 1st. That the Marine Ordinance of Louis XIV. did not expressly recognize the lien of the underwriter, but in this regard it was held not to be exclusive, and the premium was generally (perhaps not universally) held by the courts as a privileged debt. 2d. That the privilege of the underwriter for payment of the premium due upon the policy for the last voyage is expressly recognized by article 191 of the Code of Commerce, and that such privilege is also extended to time policies. 3d. That this privilege is not waived by taking premium notes, unless it is thereby intended to be discharged. Now, if the supreme court have adopted the continental law in respect to jurisdiction over contracts of insurance, must it not be presumed logically to have adopted it as an entirety, and not by piecemeal? It certainly seems so to me, and it goes very far to justify the language used by the circuit judge in the case of The Williams [supra].

It is claimed, however, that these contracts are made exclusively upon the credit of the owner. If this were so, it might be presumed in a particular case that the lien was thereby waived, but with the exception of supplies, repairs, and materials furnished in the home port, the mere fact that the contract is made by the owner does not import a waiver of lien. There is no doubt of the existence of such lien in favor of seamen, although hired by the owner in person; nor in favor of shippers, where the contract of affreightment is made with the owner. Nor is it, I believe, any objection to the lien of a lender upon bottomry, that the bond was made with the owner. In the nature of the contract itself, I see no reason forbidding such lien to the underwriter which does not apply with equal force to the salvor or material man. Their contracts differ mainly in the fact that the services of the underwriter are rendered only upon a contingency which may never happen. That the question has never before arisen is due, as before observed, solely to the fact that the contract of marine insurance was not generally recognized as maritime until the opinion was pronounced in Insurance Co. v. Dunham [supra].

Under the ruling in this case, I feel constrained to hold that the contract of insurance being maritime in its character, the underwriter is entitled to a lien upon the ship for the payment of his premium; although, for the reason given by Dufour, I think it should rank in the lowest class of strictly maritime liens.

I think, however, the libel is defective in this case, in failing to aver the names of the parties insured, and the character and extent of their interests in the vessel. I think it should also appear that the policy was a marine policy, or at least that it covered the vessel during the season of navigation.

I regard it as very doubtful whether an ordinary fire policy covering a vessel while lying at the wharf during the winter would be the subject of admiralty jurisdiction. The above quotation from Caumont, citing a judgment of the tribunal of commerce at Marseilles, apparently supports this opinion. The schedule annexed to the libel seems to indicate that the policies were issued covering separate moieties of the vessel. This, however, should be made distinctly to appear.

I think I see considerable difficulty in enforcing the lien of an underwriter upon an undivided interest of a part owner, especially if the proceeding were an original one, against the vessel itself, and not against its proceeds of sale. The same difficulty, however, frequently occurs in connection with the mortgages upon undivided interests, and I should not regard it as insuperable, and if it should appear that each moiety of his vessel was covered by a lien of the same amount, the question could be easily solved, as the effect would be practically the same as if the entire vessel was covered by a single policy. The difficulty with the libel in this case is, that it has been attempted to employ the ordinary blank libels for supplies in actions for premiums, for which they are illy adapted. Upon this ground, the exceptions to the libels must be sustained, with leave to amend.

[NOTE. On the libellant's appeal, this decree was affirmed by the circuit court, held by Swayne, Circuit Justice, who expressly indorsed the foregoing opinion. Case No. 3,974.]